Jan WYERS,
as Personal Representative of the Estate of
Dianne Terpening, Deceased,
*Plaintiff-Appellant,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
091014750; A149258 (Control)

Hazel CORNING,
*Plaintiff-Appellant,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
091116570; A149259

Violet ASBURY,
*Plaintiff-Appellant,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
091116571; A149260

Stacey WEBB,
*Plaintiff-Appellant,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
091116572; A149261

Michele SHAFTEL,
*Plaintiff-Appellant,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
091216650; A149262

Natsue AKRE,
*Plaintiff-Appellant,*

*v.*

AMERICAN MEDICAL RESPONSE NORTHWEST, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
100202934; A149263

342 P3d 129

Mark McDougal argued the cause for appellants. With him on the brief were Gregory Kafoury and Kafoury & McDougal.

Michael Estok argued the cause for respondent. With him on the brief was James K. Dumas, and Lindsay, Hart, Neil & Weigler, LLP.

Erin K. Olson and Law Office of Erin Olson, P.C., filed the brief amicus curiae for Oregon Trial Lawyers Association.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

At various points in 2009 and 2010, six women[1] filed actions for damages against defendant American Medical Response Northwest, Inc. Each woman alleged that defendant had permitted Lannie Haszard, a paramedic in its employ, to sexually abuse her while she was vulnerable. At issue in this consolidated appeal is the trial court's dismissal of each plaintiff's claim under the statute governing civil actions for abuse of a vulnerable person, ORS 124.100,[2] after the court granted defendant's summary judgment motion.[3] Plaintiffs argue that the trial court erroneously concluded that there were no genuine issues of material fact for trial based on an incorrect understanding of ORS 124.100(2) and (5). For the reasons that follow, we conclude that the trial court applied an erroneous interpretation of ORS 124.100(2) and (5). We also conclude that all plaintiffs adduced sufficient evidence for a trial on their claims. We thus reverse and remand.

We state the facts in the summary judgment record in the light most favorable to plaintiffs, the nonmoving parties. ORCP 47 C; *Miller v. Tabor West Investment Co.*, 223 Or App 700, 702, 196 P3d 1049 (2008), *rev den*, 346 Or 184 (2009).

---

[1] The original plaintiffs were Terpening, Asbury, Corning, Webb, Shaftel, and Akre. During the appeal, Terpening died, and the personal representative of her estate, Wyers, was substituted as the lead plaintiff. When we discuss facts related to the abuse, we refer to "plaintiffs" for convenience; such references are to the original plaintiffs.

[2] In relevant part, ORS 124.100 provides:

"(2) A vulnerable person who suffers injury, damage or death by reason of physical abuse * * * may bring an action against any person who has caused the * * * abuse or who has permitted another person to engage in * * * abuse.* * *[.]

"* * * * *

"(5) An action may be brought under this section against a person for permitting another person to engage in physical * * * abuse if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the physical or financial abuse."

[3] Defendant simultaneously but separately moved for summary judgment with regard to several of the plaintiffs individually, as well as with regard to all six cases on other bases pertaining to other specific issues, such as notice and statutory damages limitations. The trial court did not reach those motions and neither do we.

Haszard was a certified emergency medical technician and paramedic. Defendant, which provides ambulance services, employed Haszard to attend to persons being transported by ambulance. Haszard was authorized and required to touch ambulance patients to monitor and care for them as they were being transported. However, Haszard used his position to engage in acts of sexual abuse of various female patients, including plaintiffs, while they were being transported to the hospital. Haszard engaged in inappropriate touching of each plaintiff during her ambulance transport, when plaintiffs were either (1) ill or injured, with an impaired ability to evaluate information, communicate decisions, and protect their physical safety (Shaftel, Terpening, and Webb), or (2) elderly (Akre, Asbury, and Corning).

No plaintiff contemporaneously reported to defendant the sexual abuse she had experienced. Defendant did not learn of plaintiffs' allegations concerning their sexual abuse by Haszard until each plaintiff filed her action against defendant. However, before the abusive conduct in this case occurred, defendant had received reports of sexual misconduct by Haszard from two women—Spain and Whalen. In February 2006, Spain regained consciousness in the back of defendant's ambulance to find Haszard rubbing her hand against his crotch. She screamed, the driver asked Haszard what was happening, and Haszard replied that Spain was just delirious. Spain reported the incident to defendant, although she did not know Haszard's name at the time. Her sister witnessed Spain make the report by phone. According to deposition testimony from Newton, defendant's head of quality assurance, any and all complaints of sexual misconduct are entered into a database, and forwarded to defendant's regional operations manager and general manager. Lauer, the general manager for defendant in Oregon, testified that, generally, all efforts are made to identify complainants and contact them for more information.

A month after Spain's report to defendant, Haszard transported Whalen by ambulance to a hospital. At the hospital, Haszard was leering at Whalen, panting, while she was disrobing to change into a hospital gown. Whalen stated that Haszard was obviously sexually aroused. On a written form, Whalen described the experience with Haszard

as "highly degrading and uncomfortable" and stated that she had felt unsafe. Whalen subsequently reported the incident to Priest, a manager for defendant. Priest told Whalen that she must have been imagining things, and he filed an incident report stating that Whalen indicated that her care was "excellent" but that "she felt that there was not enough consideration for her privacy." Priest also stated that he had "had a good talk with [Haszard] and the message was well received."[4]

Around the time of the incidents of abuse involved in this case, another pair of women—Rotting and Pries—also told defendant that Haszard had molested them during ambulance transports in December 2006 and March 2007, respectively.[5] Rotting reported to Priest that during an ambulance ride on December 9, 2006, Haszard raised her gown above her waist and inappropriately touched her. Priest told Rotting that there would be an investigation. No such investigation occurred.

On December 18, 2006, a human resources manager for defendant, Fowler, sent out an email stating that Rotting's son had called on Rotting's behalf, that he said that "we should get the police involved," and that he "seems more insistent." Fowler wondered in her e-mail whether someone should call back. No one ever did. Neither did defendant notify the police that Rotting, who was 73 years old when the incident occurred, had complained that Haszard had abused her.

In March 2007, Haszard transported Pries, a knife-wound victim. Pries told the police officer who interviewed her regarding her injuries that Haszard had sexually abused her by taking her hand, placing it inside her pants, and manipulating it. That officer spoke with defendant's

---

[4] Whalen later sued Haszard, defendant, and defendant's parent company for battery based on Haszard's inappropriate sexual touching during her ambulance transport. The trial court granted the defendants' summary judgment motion. Whalen appealed, and we reversed and remanded. *Whalen v. American Medical Response Northwest*, 256 Or App 278, 300 P3d 247 (2013).

[5] The date of Rotting's report that Haszard abused her preceded the dates of Haszard's abuse of all plaintiffs except Akre. Pries's report of abuse postdated Haszard's abuse of Akre, Shaftel, Asbury, and Terpening, but preceded Haszard's abuse of Webb and Corning.

supervisor, Verkest. Verkest did not tell the officer that other women had previously reported that Haszard had sexually abused them. After the police relayed Pries's complaint to defendant, a meeting was convened that was attended by, among others, Verkest and one of defendant's risk management employees. Defendant informed Haszard in writing that the Rotting and Pries "complaints [were] closed because you have told us that these events did not happen and we have no further evidence or witness statements that they did." Defendant never contacted Pries regarding her report.

Subsequently, another woman, Herring, reported to defendant on December 8, 2007, that Haszard had molested her while transporting her to a hospital. At the hospital, Herring began screaming for someone to help her and to remove Haszard from her room. A nurse called defendant, who sent Verkest to speak with Herring at the hospital. Herring reported that Haszard had taken her hand and shoved it down the front of her pants. Verkest told Herring that he was not going to call the police, but that she could. Verkest later called the police nonemergency number and reported that Herring wanted to make a complaint about one of defendant's paramedics regarding an alleged assault. Verkest did not provide Haszard's name to the police during that call or notify them about the other, similar allegations against Haszard. The police then independently discovered Pries's complaint against Haszard and arrested Haszard on December 10, 2007. In 2008, Haszard pleaded guilty to multiple counts of attempted sexual abuse in the first degree for abusing Herring and Rotting, as well as two other women, Robbins and Hines, who came forward to the district attorney following Haszard's arrest.

Plaintiffs, who are all represented by the same attorneys, filed their actions in 2009, except for Akre, who filed in 2010. The presiding judge of the circuit court consolidated the 2009 actions and, designating the consolidated cases as complex, assigned the matter to a judge for all proceedings. Akre's action was then assigned to the same judge.

By the time of the summary judgment motion at issue on appeal, the only claim that each plaintiff was asserting in her amended complaint was a claim of physical

abuse of a vulnerable person, as provided under ORS 124.100. A "[v]ulnerable person" includes "elderly person[s]," ORS 124.100(1)(e)(A), and "incapacitated person[s]," ORS 124.100(1)(e)(C). An "'[e]lderly person' means a person 65 years of age or older." ORS 124.100(1)(a). Under ORS 124.100(1)(c), an "[i]ncapacitated" person is defined by reference to ORS 125.005(5), which provides:

> "'Incapacitated' means a condition in which a person's ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that the person presently lacks the capacity to meet the essential requirements for the person's physical health or safety. 'Meeting the essential requirements for physical health and safety' means those actions necessary to provide the health care, food, shelter, clothing, personal hygiene and other care without which serious physical injury or illness is likely to occur."

"A vulnerable person who suffers injury * * * by reason of physical abuse * * * may bring an action against any person who has caused the * * * abuse or who has permitted another person to engage in * * * abuse." ORS 124.100(2). When a plaintiff prevails in the action, ORS 124.100(2)(b) requires the court to award the plaintiff "[a]n amount equal to three times all noneconomic damages, as defined by ORS 31.710, resulting from the physical * * * abuse."

The parties disputed whether defendant had "permitted" Haszard to engage in the abuse of plaintiffs. Under ORS 124.100(5), "[a]n action may be brought under this section against a person for permitting another person to engage in physical * * * abuse if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the * * * abuse."

In a consolidated motion for summary judgment on each plaintiff's statutory claim of "vulnerable person" abuse, defendant argued that there was no genuine issue of material fact that it "permitted" physical abuse of plaintiffs and that it was entitled to judgment as a matter of law. Defendant's factual argument was premised primarily upon its legal argument regarding the proper interpretation of the text, context, and legislative history of ORS 124.100(2) and (5).

Defendants asserted that the plain and ordinary meaning of the verb "permit," as defined by various dictionaries, requires intentional or knowing conduct, not mere negligence. Defendant then pointed to other aspects of the statutory text as supporting that meaning. Defendant argued that the mental state requirement in ORS 124.100(5)—that the person "knowingly" acts or fails to act—also implies a requirement that the person have knowledge of "the * * * abuse." Defendant then reasoned that the word "the" in "the * * * abuse" relates back to the term "physical abuse" in the first clause of ORS 124.100(5), and, thus, that "the * * * abuse" necessarily refers *exclusively* to the abuse alleged by a particular plaintiff. Based on those contentions, defendant argued that ORS 124.100(5) requires a defendant's knowledge of (and subsequent intentional action or inaction regarding) the very incident of abuse committed against the plaintiff, and that that knowledge must be contemporaneous with the abuse itself.

In addition to its textual argument, defendant contended that ORS 124.100(5)'s reference to "circumstances in which a reasonable person should have known of the * * * abuse" pertains to a defendant's subjective knowledge of the abusive nature of the conduct in question. Under that reading, "should have known of the * * * abuse" refers not to a defendant's knowledge (or lack thereof) of whether a third-party perpetrator has engaged in certain conduct, but, rather, to the defendant's knowledge of the abusive nature of that conduct. In defendant's estimation, then, the phrase "should have known of * * * the abuse" prevents a defendant from avoiding liability by claiming "mistake of fact"—*i.e.,* that it subjectively knew about the third-party abuser's conduct but did not know that it objectively constituted "abuse." However, the phrase does not, argued defendant, create liability when a defendant objectively should have been aware of misconduct but actually did not know of it.

Defendant also argued that the context of ORS 124.100 supports its interpretation of "permitting." According to defendant, in *Miller*, 223 Or App 700, we construed ORS 124.100 to require a defendant's advance or contemporaneous knowledge of a third-party's abuse of the plaintiff. Additionally, defendant contended that its

interpretation of "permit" is supported by the meaning that that term carries in various criminal statutes that require a mental state greater than negligence for guilt to inhere. Defendant also highlighted the fact that ORS 124.100(2)(b) requires the court to award treble noneconomic damages to a prevailing plaintiff. Such mandatory trebling, defendant urged, evinces the legislature's intent to exclude from liability those defendants who are merely negligent, because awarding such "punitive" damages against merely negligent defendants would be inequitable and unconstitutional.

Finally, defendant pointed to the legislative history of ORS 124.100 to buttress its argument. Defendant maintained that testimony by the sponsor of the legislation clarifies that the legislature primarily intended the statute to target a narrow class of highly culpable defendants. In defendant's view, that understanding is further supported by the legislature's inclusion of related provisions that expressly exempt from liability certain institutional defendants, *see* ORS 124.115, as well as by the absence of any express legislative discussion explicitly referring to a "negligence" standard.

Plaintiffs countered that ORS 124.100(2) and (5) establish neither an intentional standard nor a negligence standard but, rather, a composite or "hybrid" standard. Plaintiffs argued that the plain text of ORS 124.100(5), which defines "permitting," requires only that a defendant knowingly failed to act when a reasonable person should, under the circumstances, have known that the abuse was likely to occur. To require a defendant's actual knowledge of the specific, later-alleged abuse before or as it is occurring, argued plaintiffs, is to ignore the statutory text referring to "circumstances in which a reasonable person *should have known* of" the abuse. (Emphasis added.) That wording, according to plaintiffs, clearly contemplates that liability is possible even when a defendant had no actual knowledge of the particular abuse later alleged by the plaintiff, but did have notice—*e.g.*, due to prior actual knowledge of past instances of abuse—that such abuse *might* occur. As plaintiffs' counsel phrased it at the summary judgment hearing, defendant "ha[s] to have knowledge of the risk instead of should have known of the risks." Under that standard,

plaintiffs argued, they had each adduced sufficient evidence to survive summary judgment.

Regarding defendant's statutory context arguments, plaintiffs argued that our decision in *Miller* supports their interpretation of ORS 124.100, not defendant's. Plaintiffs also maintained that defendant's reliance on criminal statutes was misplaced because *Miller* held that "permitting" abuse is specifically defined by ORS 124.100(5). Regarding defendant's mandatory treble damages argument, plaintiffs responded that the required damages are not punitive damages and are not prohibited by statute or the constitution.

As to the exemption of certain institutions from liability under the statute, plaintiffs argued that the very existence of such exemptions for a closed list of specific entities indicated that other institutions that are not expressly exempted by the statute—such as ambulance companies—may incur liability for permitting abuse of a vulnerable person. In plaintiffs' view, the exemptions demonstrate little more than the resourcefulness of the exempted institutions in obtaining exemptions from liability. In any case, plaintiffs reasoned, the class of persons who are potentially subject to liability under ORS 124.100 has no bearing on the mental state required for such persons to be held liable under that statute.[6]

In its written order resolving defendant's motion, the trial court agreed with defendant's interpretation of ORS 124.100 on all but one point. The court rejected defendant's reliance on dictionary definitions of "permit" to support its interpretation of ORS 124.100: "As in *Miller*, there is no need to look to the dictionary to define 'permit' because the plain text of [ORS 124.100(5)] does so." However, based on the statutory text, the court rejected plaintiffs' interpretation of ORS 124.100(5) as establishing a "hybrid" mental state. The court reasoned that ORS 124.100(5) "states that conduct constitutes 'permitting' when a person 'knowingly

---

[6] Plaintiffs also argued that defendant was judicially estopped from arguing that ORS 124.100 required more than negligence, because defendant had argued in a concurrent federal court action that ORS 124.100 only required negligence. The court rejected that argument at the hearing on defendant's summary judgment because the outcome of the federal proceeding was still pending. We need not reach the issue given our construction of ORS 124.100.

acts or fails to act,'" and that, "[i]n its most plain and ordinary usage, a 'knowing' act requires intentional conduct because one has knowledge of the prohibited conduct yet acts or fails to act in the face of it." The court also accepted defendant's argument that the text of ORS 124.100(5) "requires Plaintiffs to prove that Defendant had knowledge of the specific abuse that Lannie Haszard allegedly committed on each Plaintiff." The court concluded that "permitting" under ORS 124.100(5) "requires more than mere negligence; it requires intentional conduct." The court added that the legislature did not intend ORS 124.100 "to create liability for 'permitting' abuse where a defendant had or should have had knowledge of a 'general risk of abuse' or the 'likelihood of abuse.'"

The trial court also agreed with defendant's contextual arguments. It concluded that *Miller* supported its interpretation of ORS 124.100(5), as did the legislature's chosen penalty, treble damages. Additionally, the court relied on case law interpreting the word "permitting" in various Oregon criminal statutes to support its interpretation that ORS 124.100 requires intentional, not negligent, conduct.

The court also concluded that the legislative history of ORS 124.100 supported defendant's argument. In part, the court was persuaded that the existence of exemptions for certain businesses was relevant. The court concluded that the legislative history demonstrated that the statute "was intended to address a narrow problem with elder abuse against a limited class of defendants[,]" and "not *** to make businesses liable for negligent retention, supervision, or investigation of its employees."

Based on the above interpretation, the trial court ruled that, because defendant did not know of plaintiffs' alleged abuse at the hands of Haszard until after those incidents of abuse had occurred, plaintiffs failed as a matter of law to create a genuine issue of material fact that defendant "permitted" Haszard to abuse them. The court granted defendant's motion for summary judgment and, in each case, entered a general judgment dismissing the action.[7]

---

[7] The court declined to address the merits of defendant's six other motions as moot.

Plaintiffs now challenge the trial court's ruling on defendant's summary judgment motion.[8] The parties reassert their disparate views of the proper standard for liability for vulnerable person abuse under ORS 124.100. Because the issue is one of statutory construction, our goal is to determine the legislature's intent in enacting the statute. *Polacek and Polacek*, 349 Or 278, 284, 243 P3d 1190 (2010). In doing so, we begin with the statutory text and context, which are the best evidence of the legislature's intent. *Id.* Statutory context "includes other provisions of the same or other related statutes, the pre-existing statutory framework within which the statute was enacted, and prior opinions" interpreting the statutory wording at issue. *Id.* We may also look to legislative history to inform our examination of the statutory text and context. *See, e.g., id.* at 287. We are mindful of the admonition "not to insert what has been omitted, or to omit what has been inserted; and [that] where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all." ORS 174.010.

With that backdrop, we turn to the parties' dispute regarding the meaning of the verb "permit" as used in ORS 124.100(2) and (5). We first reject out of hand defendant's citation to selected dictionary definitions to support its proffered interpretation of that word. As the trial court correctly noted, and as we have previously concluded, ORS 124.100(5)[9] "specifically define[s]" what the legislature meant by that term as used in ORS 124.100(2). *Miller*, 223 Or App at 718 (adding that, "[g]iven that clear statutory definition, we see

---

[8] Specifically, plaintiffs assert that the trial court "erred in holding that plaintiff failed to create a genuine issue of material fact to preclude summary judgment." We construe the assignment as one asserting that the trial court erred in granting defendant's motion for summary judgment on plaintiffs' statutory abuse claims. *See Marc Nelson Oil Products, Inc. v. Grim Logging Co.*, 199 Or App 73, 75 n 1, 110 P3d 120, *adh'd to as modified on recons*, 200 Or App 239, 115 P3d 935 (2005) ("Assignments of error * * * are to be directed against rulings by the trial court, not against components of the trial court's reasoning or analysis that underlie that ruling."); *accord Eagles Five, LLC v. Lawton*, 250 Or App 413, 423 n 5, 280 P3d 1017 (2012).

[9] In *Miller*, we referred to the 2001 version of ORS 124.100, which was the version in effect at the time of the plaintiff's injury in that case. 223 Or App at 716 n 2. In that version, what is now subsection (5) was numbered as subsection (4). The text of that subsection was the same in 2001 as it was in 2008, when we issued *Miller*. Subsection (5) of the current statute contains the same text.

no reason to turn to the dictionary to ascertain the statute's meaning").[10] Thus, the issue is not the ordinary usage of the term "permitted" in ORS 124.100(2) but, rather, the meaning of the statutory text in ORS 124.100(5) defining that term.

We begin by reviewing that definition. Pursuant to ORS 124.100(5), a person "permit[s] another person to engage in physical * * * abuse if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the physical * * * abuse." The parties' dispute regarding that text reduces to what mental state, or states, apply to what parts of that definition. We first conclude, and the parties do not dispute, that the placement of the adverb "knowingly" immediately before the verb phrase "acts or fails to act" demonstrates that that adverb modifies that verb phrase.

We turn next to the phrase "under circumstances in which." That conjunctional phrase is synonymous with the single-word conjunctions "if" and "when," so that we may understand ORS 124.100(5) as referring to a "person who knowingly acts or fails to act [when] a reasonable person should have known of the * * * abuse." The phrase also functions as an adverb modifying the operative verb phrase "acts or fails to act"—in effect extending and constituting part of that operative verb phrase. We therefore conclude from the text that the requirement that a defendant "knowingly" act or fail to act also entails the requirement that the defendant know it is so acting under the requisite circumstances. In other words, ORS 124.100(5) requires that the defendant know of the existence of the requisite circumstances at the time of the alleged "permitting."

We next consider what constitutes those requisite circumstances. The text of ORS 124.100(5) requires a defendant's knowledge of circumstances under which "a reasonable person should have known of the * * * abuse." We agree with defendant and the trial court that the legislature's use of the definite article "the" in "the * * * abuse" indicates a reference to the particular abuse upon which a plaintiff's claim under ORS 124.100(5) is based, that is, the abuse

---

[10] For the same reason, we also reject defendant's and the trial court's reliance on case law construing various criminal statutes that use the verb "permit."

of the plaintiff that the defendant allegedly permitted the third-party abuser to commit.

However, for several reasons, we disagree with defendant's contention that the phrase "should have known of the *** abuse" imputes knowledge to a defendant solely concerning the nature or quality of the third-party abuser's conduct toward the plaintiff, but not concerning the existence of the conduct itself. Or, to state it another way, we reject defendant's argument that ORS 124.100(5) required each plaintiff to establish that defendant subjectively knew that Haszard was engaged in misconduct involving her at the time that the conduct was occurring.

First, defendant's interpretation does not comport with the plain text of the statute. The verb "to know" has several different meanings, only two of which are relevant here. The trial court accepted defendant's interpretation, which aligns with the definition of "know" as "to recognize the quality of : see clearly the character of : DISCERN <*knew* him for what he was> <~*s* him as honest and reliable>." *Webster's Third New Int'l Dictionary* 1252 (unabridged ed 2002) (boldface, capitalization, and italics in original). We conclude that the relevant definition of "to know" here is, instead, "to have cognizance, consciousness, or awareness of something : be aware of the existence or fact of something <*knew* of her but had not yet met her> <*knew* about what had happened>." *Id.* (boldface and italics in original). The examples provided in the former definition ("knew him for what he was" and "knows him as honest and reliable") illustrate that, for "know" to carry the definition that the trial court gave it, it must be followed by certain prepositions; *i.e.*, "for" and "as." But in the text of ORS 124.100(5), the phrase "should have known" is not followed by either of those prepositions (or any equivalent). Instead, it is followed by the preposition "of." As is evident from the examples provided in the latter definition cited above, "to know of" something is to "be aware of the existence" of something. Therefore, "should have known of the *** abuse" means "should have been aware of the existence of the *** abuse."

Second, in referring to the requisite circumstances, the legislature's use of "reasonable person" nomenclature

demonstrates that it intended to impute knowledge of the abuse to a defendant under an objective standard. Such a standard is inconsistent with defendant's contention that the legislature intended to require actual, subjective knowledge of the actions, the misconduct, that the abuser directed against the plaintiff.

Third, we note that the abuser's actions are the substance of the "abuse." Thus, in our view, defendant's asserted distinction between the quality of the misconduct and the actions themselves is not a plausible reading of the phrase "should have known of the * * * abuse" in ORS 124.100(5).

Our rejection of defendant's proffered reading of the phrase leads us to the ultimate question regarding what the legislature intended by it. In conjunction with our earlier conclusion that ORS 124.100(5) requires a defendant's knowledge that it is acting under the requisite circumstances, we conclude that, under the plain text of ORS 124.100(5), the legislature intended to impose liability if the defendant acted or failed to act with knowledge that would lead a reasonable person to conclude that the plaintiff was being abused or would likely be abused in the manner alleged by the plaintiff. From that, we conclude that the legislature most likely intended that "permitting" abuse requires that the defendant have knowledge of facts establishing that it knew of the substantial risk of the abuse actually suffered by the plaintiff. That conclusion is supported by the context and legislative history of ORS 124.100.

We begin our examination of the context with an analysis of *Miller*, which both parties and the trial court invoked as support for their respective interpretations of ORS 124.100(5), and which is the lone Oregon appellate decision to date that addresses the nature and quantum of evidence that a plaintiff must adduce to prove that a defendant "permitted" a third-party to abuse a vulnerable person. We conclude that *Miller* both undermines defendant's proffered interpretation of ORS 124.100(5) and is consistent with our understanding of the statute.

*Miller* involved an assault by one tenant in an apartment complex, Woods, against the plaintiff, who also lived in

the complex. The assault occurred off-premises, at a convenience store adjacent to the apartment complex. The plaintiff brought an action against the owners of the apartment and their property managers, alleging claims for negligence and for damages under ORS 124.100(5). Regarding the vulnerable person abuse claim, the plaintiff argued that the defendants (through their agent, Owen, the on-site apartment manager) "permitted" Woods to assault the plaintiff "by failing to take any action to prevent the abuse under circumstances in which a reasonable person should have known of the abuse." *Miller*, 223 Or App at 717. The trial court granted summary judgment in favor of the defendants, and we affirmed.

With regard to the construction of ORS 124.100(5), we explained that the

> "'physical abuse' alleged to have been permitted by defendants here is Woods's assault on plaintiff at the 7-Eleven store. Thus, defendants could be liable under the statute only if they 'knowingly act[ed] or fail[ed] to act under circumstances in which a reasonable person should have known of' *that* assault."

*Id.* at 718 (emphasis added; brackets in original). That description of what was needed for liability comports with our conclusion, above, based on the statutory text, that "the *** abuse" referred to in ORS 124.100(5) is the particular abuse upon which a plaintiff's claim under that statute is based. In *Miller*, we then reasoned that, therefore, "[t]o survive summary judgment, *** plaintiff had to submit evidence from which a jury could conclude that defendants failed to act to prevent an assault that a reasonable person should, under the circumstances, have known that Woods would commit." *Id.* at 718.

We concluded that the record did not support such a finding. The record established that Owen did not witness any interaction between Woods and the plaintiff on the day of the assault. *Id.* The "only evidence of possibly negative interaction between the two men of which Owen was aware was a 'push' the day before," which "likely was 'a friendly push.'" *Id.* at 719. The plaintiff and Woods generally interacted several times daily and there was "no evidence that

Woods reacted negatively to any of those visits or from which to infer that Owen knew that Woods felt animosity toward plaintiff." *Id.* "In short, there [was] no evidence from which a jury could conclude that a reasonable person under those circumstances 'should have known' that Woods would follow plaintiff off the premises and violently assault him." *Id.*

Citing that analysis from *Miller*, the trial court concluded, as noted above, that ORS 124.100(5) required defendant's knowledge of the specific abuse alleged by each plaintiff. We disagree. It may be that, in isolation, our conclusion in *Miller* that, under ORS 124.100(5), a plaintiff must prove that a reasonable person under the circumstances should have known that the specific instance of abuse in question "would" occur, is susceptible to such an interpretation—*i.e.*, that a defendant's actual *fore*knowledge of the specific abuse is required. Nevertheless, we do not view *Miller* as so holding, which would be at odds with our analysis of the statutory text.

Such a reading of *Miller* also fails to account for the remainder of our analysis in that case. In our factual analysis, we considered the defendant's awareness (or lack thereof) of (i) the actual instance of abuse; (ii) Woods's interaction with the plaintiff on the day of the abuse; (iii) Woods's interaction with the plaintiff on the day before the abuse; and (iv) past interactions, generally, between Woods and the plaintiff. That final category indicates that our consideration of the facts extended to encompass the entirety of the history between Woods and the plaintiff. We noted that there was "no evidence that Woods reacted negatively" in visits with the plaintiff and no evidence "that Owen knew that Woods felt animosity toward plaintiff." 223 Or App at 719.

Our subsequent conclusion, that there was "no evidence from which a jury could conclude that a reasonable person under those circumstances 'should have known' that Woods would follow plaintiff off the premises and violently assault him," implies that, conversely, the existence of such evidence—*i.e.*, a history of negative interactions between the plaintiff and Woods or of animosity by Woods toward the plaintiff—would have allowed a jury to conclude that

a reasonable person under the circumstances should have known that Woods "*would* follow plaintiff off the premises and violently assault him." *Id.* (emphasis added). Thus, our analysis in *Miller* indicates that evidence of facts regarding the general relationship between a plaintiff and an alleged abuser can serve as a basis from which a jury could conclude that a reasonable person should have known that the abuser "would" commit the specific abuse alleged by the plaintiff. In other words, that a reasonable person under the circumstances should have known that a third-party abuser "would" commit the alleged abuse reduces to knowledge of the substantial risk of abuse, as we have concluded above based on the text of ORS 124.100(5).

Before we turn to our analysis of the facts of this case, we address the remainder of defendant's arguments regarding the proper interpretation of ORS 124.100(5). We first consider the trial court's conclusion that the requirement in ORS 124.100(2) of treble damages denotes the legislature's intent to require a defendant to have a higher culpable mental state than negligence. As an initial matter, the premise of defendant's argument—that plaintiff urges that mere negligence is sufficient—is incorrect. As noted above, the knowledge requirement is more akin to the standard for reckless conduct than for negligent conduct.

In addition, we addressed and rejected a similar argument in *Herring v. American Medical Response Northwest*, 255 Or App 315, 323-26, 297 P3d 9, *rev den*, 353 Or 867 (2013).[11] There, we concluded that nothing in the text, context, or legislative history of ORS 124.100(2)(b), the treble damages provision, supported defendant's argument that that provision includes a heightened mental state requirement. *Id.* at 324-25. In so holding, we specifically rejected the defendant's characterization of two cases— *Holman Transfer Co. v. PNB Telephone Co.*, 287 Or 387, 599 P2d 1115 (1979), and *Springer v. Jenkins,* 47 Or 502, 84 P 479 (1906)—that defendant adduces in these proceedings to make its arguments regarding the import of the mandatory

---

[11] Although we issued our opinion in *Herring* after the trial court in this case issued its order and judgments, "[e]rror *** must be determined by the law existing at the time the appeal is decided, and not as of the time of trial." *State v. Jury*, 185 Or App 132, 136, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003).

damages provision in ORS 124.100. As in *Herring*, we reject defendant's suggestion that a statutory penalty implies a heightened standard for liability when that standard is not stated in the statute.

Finally, we turn to defendant's argument that the exemptions from liability and legislative history concerning those exemptions demonstrate that the legislature intended ORS 124.100 to have a narrow focus with limited liability. The trial court agreed with defendant that the legislative history of ORS 124.100 supports the conclusion that the statute was not intended to target corporate entities like defendant. We conclude from the legislative history that the abuse statutes have a strong remedial purpose that undercuts defendant's reading of the statute.

Since its enactment in 1995, the legislature has amended the statutory scheme of which ORS 124.100 is a part numerous times. In each instance, the legislature extended the scope and reach of that scheme. *See* Or Laws 1997, ch 249, § 41 (expanding the class of persons protected by the law); Or Laws 1999, ch 305, §§ 1-3 (eliminating the requirement of a fiduciary relationship between the abuser and the victim); Or Laws 1999, ch 875, § 8 (expanding the list of conduct that can constitute abuse); Or Laws 2001, ch 843, § 3 (expanding the category of persons who have standing to bring claims under the statute); Or Laws 2003, ch 265, § 1 (granting the Attorney General and district attorneys authority to issue and enforce investigative demands pertaining to the statute); Or Laws 2003, ch 577, § 4 (expanding the list of conduct that can constitute abuse); Or Laws 2003, ch 211 (adding mandatory treble damages provision); Or Laws 2005, ch 87 (expanding the category of persons who have standing to bring claims under the statute); Or Laws 2005, ch 386 (expanding the class of persons protected by the statute). The legislature has not amended ORS 124.100 to 124.140 to limit or narrow their scope. That history indicates that, through ORS 124.100, the legislature intends to offer robust protection for vulnerable persons.

Both defendant and the trial court cited the same passage of testimony from the sponsor of the bill creating the statutory protections for vulnerable persons, Lisa Bertalan,

to support the conclusion that the legislature intended ORS 124.100 to have a narrow focus. Bertalan testified that

> "[t]he purpose of [the bill] is to protect elders and incapacitated adults from physical or financial abuse * * *. The aim of Senate Bill 943 is to prevent and provide a specific remedy for physical and financial exploitation from relatives, the new 'friend' who suddenly cuts the elderly person off from family and the rest of the world, phony contractors who sell the elderly person substandard services or unnecessary goods, and the acquaintance who suddenly becomes the elderly person's live-in caregiver in exchange for the deed to the family home or other property.

> "The Bill is not meant to target institutional providers of care or services such as nursing homes, residential care facilities, banks or brokerage houses * * *. [T]his most often is not where the problem lies and other remedies exist to resolve those abuses."

Testimony, House Committee on Judiciary, SB 943, May 12, 1995, Ex D (statement of Lisa Bertalan). That testimony, coupled with the exemption of certain entities from liability, led the trial court to conclude that ORS 124.100 was intended to address a narrow problem with vulnerable person abuse against a limited class of defendants and not to make businesses liable for negligent retention, supervision, or investigation of its employees.

Although the testimony refers to examples of individual, and not institutional, abusers, that cannot overcome the actual text of the statute or our analysis above of that text and context. First, in the context of a claim alleging liability for "permitting" the conduct of a third-party abuser, the examples provided—all of which are examples of parties that would be liable for directly abusing a plaintiff—are not especially relevant, and, if anything, demonstrate that the examples do not function to limit the class of potential defendants, because that class expressly includes those who only "permit" abuse.

Furthermore, the list of entities that the testimony indicates were not meant to be targeted—"institutional providers of care or services such as nursing homes, residential care facilities, banks or brokerage houses"—were ultimately

all expressly exempted under ORS 124.115, which provides, in relevant part:

"(1) Except as provided by subsection (2) of this section, an action under ORS 124.100 may not be brought against:

"(a) Financial institutions, as defined by ORS 706.008;

"(b) A health care facility, as defined in ORS 442.015;

"(c) Any facility licensed or registered under ORS chapter 443; or

"(d) Broker-dealers licensed under ORS 59.005 to 59.541."

Under subsection (2), "[a]n action may be brought under ORS 124.100 against a person listed in subsection (1) of this section" under certain circumstances not relevant here. The express inclusion of a closed universe of exemptees in ORS 124.115 indicates that any entity not included in that list is potentially subject to liability under ORS 124.100.

Having determined that, under ORS 124.100(5), a plaintiff may bring an action against a defendant for "permitting" another person to engage in physical abuse if the defendant knowingly acted or failed to act when the defendant was aware of the substantial risk that the abuser would commit the abuse that the plaintiff suffered, we turn to whether the evidence adduced by plaintiffs was sufficient to defeat defendant's motion for summary judgment in this case. The trial court concluded that plaintiffs failed, as a matter of law, to demonstrate a genuine issue of material fact that defendant "permitted" Haszard to abuse them, because plaintiffs failed to provide evidence that defendant knew of the abuse alleged by each plaintiff, at the time that that abuse occurred. We assess, under the proper interpretation of ORS 124.100(5), whether plaintiffs adduced sufficient evidence to create a material issue of fact for trial.

"A genuine issue of material fact exists if, viewing the record in the light most favorable to the party opposing summary judgment, an objectively reasonable juror could return a verdict for that party on the matter that is the subject of the motion for summary judgment." *Burgdorf v. Weston*, 259 Or App 755, 760, 316 P3d 303 (2013), *rev den,*

355 Or 380 (2014). We readily conclude that an objectively reasonable juror could find from the evidence on summary judgment that defendant knew of the substantial risk that Haszard would sexually abuse plaintiffs and that defendant knowingly failed to take any action in light of that knowledge.

Here, plaintiffs have produced evidence that, viewed in the light most favorable to them, shows that, before any of the abuse of any of the plaintiffs, defendant knew that Haszard had a history of being accused of the same kind of abuse, by precisely the same category of victim. Both Spain and Whalen made their complaints to defendant before the earliest incident of abuse alleged in this case (Akre's). Spain, in particular, alleged the more specific type of abusive conduct later alleged by the plaintiffs here: inappropriate touching by Haszard while she was incapacitated in the back of the ambulance. Plaintiffs also presented evidence that would allow a reasonable juror to conclude that defendant's management knew of Haszard's inclination to commit sexual abuse against this particular class of "vulnerable" individuals. According to testimony from one of defendant's employees, all complaints of sexual misconduct are entered into a database and forwarded to defendant's regional operations manager and general manager.

Plaintiffs also offered evidence that defendant received, and was aware of, additional complaints of Haszard's sexual abuse of women under his charge. In addition to complaints by Spain and Whalen, a third victim, Rotting, reported to defendant that Haszard had abused her. Defendant received Rotting's report before the abuse alleged by all plaintiffs here except for Akre. And, before two plaintiffs, Webb and Corning, were abused, defendant had received its fourth complaint about Haszard's sexual abuse of women in the back of the ambulance from Pries.

Finally, plaintiffs produced evidence from which a reasonable juror could conclude that defendant knowingly failed to act regarding its knowledge of the risk that Haszard was a serial predator who would sexually abuse additional women, such as plaintiffs, if permitted to do so. Defendant downplayed and misrepresented the nature of

Whalen's complaint. Rotting testified that manager Priest informed her following her complaint that defendant would investigate the matter. However, it never did so, and it failed even to contact Rotting after internal communications circulated among defendant's management personnel on the subject. When police contacted supervisor Verkest about Pries's complaint, Verkest failed to inform the officer that defendant had previously received complaints of sexual abuse by Haszard. Defendant's personnel convened a meeting regarding the allegations but closed the complaints without taking any action, apparently on the basis that Haszard himself had told defendant that he had not abused anyone.

In sum, on the record here, there is sufficient evidence from which a reasonable juror could find that defendant "permitted" Haszard to sexually abuse plaintiffs. We therefore conclude that the trial court erred when it granted defendant's motion for summary judgment.

Reversed and remanded.